## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHARLES COX,

      Plaintiff,

vs.                                                                          Civ. No. 06-656 JP/CG

THE NEW MEXICO DEPARTMENT OF PUBLIC SAFETY;
JOHN DENKO, in his individual capacity and in his official
capacity as Secretary of the New Mexico Department of Public
Safety; CARLOS MALDONADO, in his individual capacity and
in his official capacity as Deputy Secretary of the New Mexico
Department of Public Safety; MARK ROWLEY, in his individual
capacity and in his official capacity as Deputy Director, Motor
Transportation Division; LAWRENCE HALL, in his individual
capacity ; and PETER OLSON, in his official capacity as
Communications Director of the New Mexico Department of Public
Safety,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On April 19, 2007 Plaintiff Charles Cox filed a Motion for Partial Summary Judgment

(Doc. No. 57) ("Plaintiff's MPSJ").  On April 23, 2007 Defendants New Mexico Department of

Public Safety, John Denko, Carlos Maldonado, Matthew Murray,[1] Mark Rowley, Lawrence Hall,

and Peter Olson filed a Motion for Summary Judgment (Doc No. 62) ("Defendants' MSJ").  The

Court conducted a pretrial conference and motion hearing on June 22, 2007.  Plaintiff was

represented by attorneys Cindi L. Pearlman and Jan Petersen.  Defendant was represented by

attorney Mark E. Komer.  The Court heard oral argument from both parties concerning the issues

raised in the parties' motions. Having considered these arguments, the briefs, and evidence in

---

[1] Defendant Matthew Murray is no longer a party to this motion because he was dismissed with prejudice from the case by stipulation of the parties.  *See* June 22, 2007 Stipulation of Dismissal (Doc. No. 73).

the record, the Court concludes that Defendants' MSJ should be granted in part and that

Plaintiff's MPSJ should be reviewed by the First Judicial District Court, Santa Fe County, State

of New Mexico, on remand.

## I.      INTRODUCTION

This case arises out of Plaintiff's termination from the New Mexico Department of Public

Safety ("DPS").  Plaintiff alleges that Defendants Denko, Maldonado, Rowley, and Hall

retaliated against him for exercising his First Amendment rights and engaging in protected Title

VII conduct, and deprived him of his Fourteenth Amendment Right to Substantive Due Process

when they conspired to have him fired from his position with DPS.  Plaintiff further alleges that

Defendant Olson violated the New Mexico Inspection of Public Records Act ("IPRA") by

refusing to provide Plaintiff with documents that he had requested.  In his Complaint, Plaintiff

asserts the following claims:

> Count I:  Title VII Retaliation asserted against DPS;
>
> Count II:  First Amendment Retaliation under 42 U.S.C. §1983 asserted against Defendants Denko, Maldonado, Rowley and Hall;
>
> Count III:  Deprivation of Fourteenth Amendment Right to Substantive Due Process under 42 U.S.C. §1983 asserted against Defendants Denko, Maldonado, Rowley and Hall; and
>
> Count IV:  Violation of the New Mexico Inspection of Public Records Act, NMSA 1978 § 14-2-1 et. seq., asserted against Defendant Olson.

Defendants seek summary judgment on all of these claims, while Plaintiff seeks summary

judgment on his IPRA claim in Count IV of the Complaint.

## II.     FACTUAL BACKGROUND

Plaintiff Cox was employed by Defendant DPS for sixteen years until his termination on

October 28, 2005.  Notice of Final Disciplinary Action, Defs.' MSJ, Ex. 1.  At the time of his

termination, Plaintiff was Captain of the DPS Motor Vehicle Transportation Division, Southern

Zone.

 The events leading up to Plaintiff's termination began on August 5, 2004, when Plaintiff

had lunch with Defendant Hall and four other DPS officers, Michael Brian Credeur, Hal Philip

Caroland, Tim Labier, and Fritz Wagoner.  Intra Departmental Correspondence at 1, Defs.' MSJ,

Ex. 5.  According to Defendant Hall, the group was standing in the parking lot of a restaurant

when Plaintiff asked Defendant Hall if he had received the latest complaint concerning

Patrolman Howard Baker, an African-American DPS employee under Defendant Hall's

command.  *Id*.  After Defendant Hall responded that he had not yet been able to address the

complaint, Plaintiff said, "I'd like to nail his black ass!" in reference to Patrolman Baker.  *Id*.  As

the officers parted, Patrolman Caroland entered Defendant Hall's vehicle and mentioned that

Plaintiff "better be careful about making those black ass comments."  *Id*.

 On August 9, 2004 Plaintiff observed Patrolman Baker conduct a traffic stop while not in

proper uniform.  Charles Cox Dep. at 106-09, Pl.'s Response to Defs.' MSJ, Ex. R.  When he

called Defendant Rowley, one of Patrolman Baker's supervisors, to discuss this incident,

Plaintiff was instructed to speak to Patrolman Baker's immediate supervisor, Defendant Hall,

and to put his complaint into writing.  *Id*.  Defendant Hall informed Plaintiff that he would

address Plaintiff's concerns and phoned Patrolman Baker later that day to give him a verbal

correction.  Intra Departmental Correspondence at 1, Defs.' MSJ, Ex. 5.  This did not mark the

end of this particular incident, however, as Defendant Hall learned in late August 2004 that

Plaintiff had filed an internal affairs complaint against Patrolman Baker based on the traffic stop.

*Id*. at 2.  In that complaint, Plaintiff wrote that he believed "Officer Baker can do what he wants, when he wants, where he wants, because of past issues with the Department of Public Safety and just maybe his ethnicity."  Complaint Form at 2, Defs.' MSJ, Ex. 23.

Consequently, on August 30, 2004 Defendant Hall spoke with Defendant Rowley about the tension between Plaintiff and Patrolman Baker.  Intra Departmental Correspondence at 2, Defs.' MSJ, Ex. 5.  Defendant Hall also informed Defendant Rowley of Plaintiff's August 5, 2004 comment and apologized for not bringing this issue to Defendant Rowley's attention at an earlier date.  Intra Departmental Correspondence, Defs.' MSJ, Ex. 4.  Defendant Hall stated that he did not raise this issue earlier because he did not want to create any friction between himself and Plaintiff, nor did he want to have any sort of stigma attach to his division.  *Id*.  As the supervisor for both Plaintiff and Patrolman Baker, Defendant Rowley directed Defendant Hall to put his complaint into writing and contact Janice Hightower, DPS' Equal Employment Opportunity Officer, after Defendant Hall told him that he believed Plaintiff's recent actions were a result of racial animus against Patrolman Baker.  Intra Departmental Correspondence at 2, Defs.' MSJ, Ex. 5.  Defendant Hall submitted his written complaint to Ms. Hightower on September 24, 2004.  *Id*. at 1.

In the course of her investigation, Ms. Hightower interviewed all of the officers present when Plaintiff allegedly made his racist comment about Patrolman Baker.  After Plaintiff was provided with a copy of the complaint against him, Plaintiff adamantly denied making any derogatory remarks about Patrolman Baker.  Final Report and Recommendations at 2, Defs.' MSJ, Ex. 8.  Rather, Plaintiff professed that he had stated something to the effect of "[s]omebody needs to get a handle on him" in reference to Patrolman Baker.  *Id*.  Later on in the interview,

4

Plaintiff said that he believed Patrolman Baker was not being held to the same standards as other DPS officers. *Id.* When asked if he had concluded that this was due to Patrolman Baker's race, Plaintiff responded that he believed Patrolman Baker's previous legal disputes with DPS had rendered him "untouchable." *Id.*

Patrolman Caroland confirmed to Ms. Hightower that he had heard Plaintiff say something like "nail or get his black ass" in reference to Patrolman Baker. *Id.* at 3. Patrolman Caroland stated that the comment was made in the break room of the Anthony Port of Entry. Hal Philip Caroland Dep. at 30-33, Pl.'s Response to Defs.' MSJ, Ex. B.

Lieutenant Credeur told Ms. Hightower that he might have heard Plaintiff say something like "nail his black ass," but that he did not want "to call [Plaintiff] on it in front of [their] subordinates." Final Report and Recommendations at 3, Defs.' MSJ, Ex. 8; *see also* Michael Brian Credeur Dep. at 21-22, Pl.'s Response to Defs.' MSJ, Ex. E. Lieutenant Credeur later served a brief suspension for failure to report Plaintiff's remarks. Janice Hightower Dep. at 100-01, Pl.'s Response to Defs.' MSJ, Ex. G. When Lieutenant Credeur appealed the proposed suspension, the officer/administrative law judge who conducted the hearing found that Lieutenant Credeur had indeed heard Plaintiff's comments about Patrolman Baker. *Id.*

Sergeant Labier told Ms. Hightower that he had no recollection of Plaintiff saying anything about "nail[ing]" Patrolman Baker's "black ass." Final Report and Recommendations at 3, Defs.' MSJ, Ex. 8. Nevertheless, he did recall having a discussion with the officers in which Plaintiff provided a critique of Patrolman Baker's job performance. *Id.* at 3-4. In addition, Sergeant Labier recalled being told by Plaintiff about an incognito call Plaintiff had made to Patrolman Baker, who was a recruiter for DPS' Motor Vehicle Transportation Division.

*Id.*  According to Sergeant Labier, Plaintiff stated that he had disguised his voice and pretended to be a person interested in applying for a job with DPS.  *Id.*  Plaintiff told Sergeant Labier that Patrolman Baker had inappropriately responded to his fictitious request for employment information.  *Id.*

Sergeant Wagoner stated to Ms. Hightower that he did not hear any racist remarks by Plaintiff.  *Id.* at 4.  He also professed his belief that Patrolman Baker was not adequately disciplined by his supervisors because of his race.  *Id.*

Based on this information and her own credibility assessments, Ms. Hightower concluded that Plaintiff had in fact made the racist comment about Patrolman Baker.  *Id.* at 4-7. Accordingly, she determined that Plaintiff had lied when he denied making the statement and had also implicitly accused Defendant Hall, Patrolman Caroland, and Lieutenant Credeur of fabricating the incident.  *Id.* at 6.  Based on all of these factors, Ms. Hightower recommended that Plaintiff be terminated.  *Id.*

Ms. Hightower submitted her report, including witness interview transcripts and other materials, to Defendant Maldonado, Deputy Secretary of DPS.  Defendant Maldonado sustained Ms. Hightower's report in January, 2005.  *Id.* at 9.  Defendant Maldonado then passed the report along to Defendant Denko, Secretary of DPS.  Defendant Denko was responsible for the final decision to terminate Plaintiff.  John Denko Dep. at 5, Defs.' MSJ, Ex. 15.  While he recognized that there were some differences in the officers' testimony and that two of the officers present had stated that they had not heard Plaintiff make any racist comments, Defendant Denko concluded that Plaintiff had in fact made the statement and had lied about not doing so during the investigation.  *Id.* at 6.

While this process was running its course, DPS opened a second investigation of Plaintiff concerning allegations of sexual harassment against a female subordinate, Sergeant Janine Trujillo.  *See* Notice of Contemplated Disciplinary Action at 3-4, Defs.' MSJ, Ex. 19.  These allegations were also sustained.  *Id.*  In the meantime, on June 7, 2005 Plaintiff filed an intra departmental correspondence concerning New Mexico State Police Sergeant Jaime Leyva, who Plaintiff stated had arrived intoxicated at a crime scene.  *See* Defs.' MSJ, Ex. 24.

On August 1, 2005 Defendants Denko and Maldonado sent Plaintiff an initial Notice of Contemplated Disciplinary Action which outlined the charges against Plaintiff.  Notice of Contemplated Disciplinary Action at 1-3, Defs.' MSJ, Ex. 19.  Plaintiff was invited to respond in writing to the charges against him.  *Id.* at 5.  On August 25, 2005 Plaintiff submitted his response to the Notice of Contemplated Disciplinary Action.  *See* Defs.' MSJ, Ex. 20.  On October 4, 2005 Defendants Denko and Maldonado sent Plaintiff an Amended Notice of Contemplated Disciplinary Action in which they addressed the issues raised by Plaintiff in his response.  *See* Defs.' MSJ, Ex. 21.  Plaintiff was again given the opportunity to respond to the charges against him.  *Id.* at 7.  On October 24, 2005 Plaintiff submitted his response to the Amended Notice and raised for the first time his arguments pertaining to retaliatory conduct on the part of DPS.  *See generally* Defs.' MSJ, Ex. 22.

Finally, on October 26, 2005 Defendant Denko sent Plaintiff a Notice of Final Disciplinary Action which set Plaintiff's termination date as October 28, 2005 and listed as the grounds for Plaintiff's termination: (1) violating DPS' policy regarding racial harassment by making an offensive, racially-charged remark about Patrolman Baker; (2) acting untruthfully during the investigation of this comment; (3) taking overt actions that indicated that Plaintiff was

7

acting on his racial animus against Patrolman Baker; and (4) engaging in gender discrimination

against Sergeant Trujillo.  Notice of Final Disciplinary Action at 2-8, Defs.' MSJ, Ex. 1.

Plaintiff had an opportunity to appeal his termination to the New Mexico State Personnel Board,

but his appeal was dismissed for lack of jurisdiction because it was untimely.  *See* Letter from

N.M. State Personnel Board, Defs.' MSJ, Ex. 2.

## III.      STANDARD: Motions for Summary Judgment and Qualified Immunity

Summary judgment is appropriate only if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  *Santana v. City and County of*

*Denver*, 488 F.3d 860,864 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)).  The court must

examine the record and draw reasonable inferences therefrom in the light most favorable to the

non-moving party.  *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

Summary judgment is proper where the record, taken as a whole, could not lead a rational trier of

fact to find for the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986) (citation omitted).  "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).

In the specific context of qualified immunity, the Tenth Circuit has stated:

We review summary judgment decisions involving a qualified immunity defense
somewhat differently than other summary judgment rulings.  This difference arises from
the unique nature of qualified immunity, which is designed to protect public officials
from spending inordinate time and money defending erroneous suits at trial.

*Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (alterations, internal quotation

marks, and citation omitted).  Qualified immunity protects "government officials performing

discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once "a defendant raises qualified immunity as a defense, the plaintiff must meet a heavy two-part burden." *Martinez v. Carr*, 479 F.3d 1292, 1294 (10th Cir. 2007) (internal quotation marks and citation omitted).  The plaintiff must demonstrate that the defendant violated a constitutional or statutory right and that the right was clearly established at the time of the conduct at issue.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).

"A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).  If a plaintiff meets this two-part burden, then the burden shifts to the defendant to show that there are no genuine issues of material fact which will defeat the claim for qualified immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992).  For a plaintiff's claim to survive summary judgment, the record must contain facts that rebut the presumption of an entitlement to qualified immunity.  *See Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001).

IV.     DISCUSSION

In their MSJ, Defendants assert that they are entitled to summary judgment on Plaintiffs'
Title VII retaliation claim, New Mexico Constitution claims, New Mexico IPRA claim, and
claim for injunctive relief, and qualified immunity on Plaintiff's First Amendment retaliation
claim and Fourteenth Amendment substantive due process claim.  In Plaintiff's MPSJ, Plaintiff
requests that the Court grant his motion as to his claim that Defendant Olson violated the New
Mexico IPRA.

A.      Title VII Retaliation Claim

Defendants argue that Plaintiff cannot establish a prima facie case of Title VII retaliation
because he did not engage in protected conduct and cannot establish the requisite causal
connection between the alleged protected activity and his termination.  Defendants further assert
that even if Plaintiff can establish a prima facie case, he lacks evidence to establish that
Defendants' non-discriminatory reasons for his termination are pretextual.

Title VII makes it unlawful to retaliate against an employee for opposing practices made
unlawful by the statute.  42 U.S.C. § 2000e-3(a).  A prima facie case of retaliation requires a
plaintiff to show: (1) that he engaged in protected opposition to discrimination; (2) that a
reasonable employee would have found the challenged action materially adverse - that is, that
the action might "dissuade[ ] a reasonable worker from making or supporting a charge of
discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-15 (2006)
(quotation omitted); and (3) that a causal connection exists between the protected activity and
the materially adverse action.  *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d
1193, 1202 (10th Cir. 2006).  "Once the plaintiff establishes a prima facie case, the burden shifts

to the employer to articulate a legitimate nondiscriminatory reason for the adverse action.  If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual."  *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).  If there is reason to believe the employer's reasons are pretextual, the case may be submitted to the jury.

      Here, Defendants claim that Plaintiff has not established a prima facie case because he has failed to carry his burden on the first and third factors outlined above.  Though Plaintiff's allegations and complaints pertaining to Patrolman Baker were indeed vague and general ("Officer Baker can do what he wants, when he wants, where he wants, because of past issues with the Department of Public Safety or just maybe because of his ethnicity"), this is not necessarily fatal to his claim for Title VII retaliation.  Even the authority cited by Defendants suggests that under certain circumstances, vague assertions may qualify as protected opposition. *See e.g., E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983) (finding protected opposition where a plaintiff's "letter did not protest any specific instance or instances of unlawful discrimination, but rather stated only that 'racism' and 'discrimination' were prevalent . . . [and] was primarily worded as a protest against the presentation of [an] award to . . . [another] employee, and only secondarily as an objection to [the employer's] policies themselves").  Thus, assuming Plaintiff has satisfied the first factor of this test, the Court must determine whether there is a causal connection between the protected activity and Plaintiff's termination.

      While Defendants do reference Plaintiff's comments to Ms. Hightower and internal complaint pertaining to Patrolman Baker in their decision to terminate Plaintiff, these are only of

secondary importance as additional evidence of Plaintiff's racial animus against Patrolman

Baker.  The evidence in the record is quite clear that the primary cause for Plaintiff's termination

was his having made the racist remark about Patrolman Baker and having lied about that fact

during the subsequent investigation.  *See* Notice of Final Disciplinary Action at 1-3, Defs.' MSJ,

Ex. 1.  In addition, Plaintiff's gender discrimination against Sergeant Trujillo is listed as an

entirely independent ground for Plaintiff's termination.  Given these facts, there does not appear

to be any causal connection between any protected opposition Plaintiff may have engaged in and

his eventual termination.

      Plaintiff maintains, however, that Defendants engaged in a conspiracy to retaliate against

Plaintiff because he had filed the internal complaint about Patrolman Baker.  This allegation is

unsupported by any evidence, and the argument itself is tenuous at best.  According to Plaintiff,

the first act in the conspiracy was a meeting between Defendants Hall and Rowley in which the

two "likely . . . decided that something should be done to muzzle [Plaintiff] before Baker filed

another discrimination complaint."  Plf.'s Undisputed Fact 13, Plf.'s Response to Defs.' MSJ.

Plaintiff asserts that Defendant Hall then fabricated the story about the racist statement attributed

to Plaintiff and only then decided to report it even though it had supposedly occurred over three

weeks earlier.  *See id.*  This account is unconvincing for two reasons.  First, Defendant Rowley

was the person who actually instructed Plaintiff to put his complaint about Patrolman Baker into

writing.  It seems highly unlikely that Defendant Rowley would tell Plaintiff to formally submit

a complaint, then retaliate against him for doing so.  Second, and more importantly, there is no

evidence suggesting that Defendant Hall was aware of the contents of Plaintiff's internal

complaint beyond generally knowing that it concerned Patrolman Baker being out of uniform

during a traffic stop.  *See* Defs.' Undisputed Fact 12, Defs.' MSJ.  Without knowing that Plaintiff's comments may have extended to complaining of preferential treatment for Patrolman Baker based on race, Defendant Hall could simply not have engaged in Title VII retaliation. Therefore, Plaintiff has failed to create a genuine issue of material fact as to whether his filing of the complaint against Patrolman Baker was the cause of his eventual termination.

Even assuming that the third factor was satisfied and that Plaintiff had established a prima facie case of Title VII retaliation, Defendants have stated two legitimate, non-discriminatory reasons for terminating Plaintiff, and Plaintiff has not adequately demonstrated that these reasons are a pretext for unlawful discrimination.  *See Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).  The Court notes that though none of the parties devotes much time to discussing Plaintiff's engagement in gender discrimination against Sergeant Trujillo, this incident is listed as a ground for Plaintiff's termination and Plaintiff has not alleged that it was pretextual.  *See* Notice of Final Disciplinary Action at 4-8, Defs.' MSJ, Ex. 1.

"The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."  *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Amtrak v. Morgan*, 536 U.S. 101 (2002).  "In determining whether the proffered reason for a decision was pretextual, [the court] examine[s] the facts as they appear to the person making the decision."  *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (internal quotation marks omitted).

Defendant Denko ultimately decided to terminate Plaintiff because he had concluded that

Plaintiff had lied about not making the racist remark and had implicitly falsely accused other DPS officers of fabricating the incident.  Nothing in the record suggests that Defendant Denko harbored any retaliatory motive against Plaintiff, and the totality of the circumstances indicates that Defendant Denko acted in good faith and based his decision on reliable information provided to him by Ms. Hightower.  There is no evidence that his decision was a pretext for a desire to terminate Plaintiff based on his complaint about Patrolman Baker, nor has Plaintiff demonstrated that he was the victim of a "cat's paw"[2] situation in which "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *BCI Coca-Cola*, 450 F.3d at 484. Under this theory, Plaintiff asserts that Defendant DPS can be held liable for the claimed bias of Ms. Hightower or the Defendant DPS officers even if Defendant Denko lacked discriminatory intent.  However, in order to prevail on this theory, Plaintiff "must show that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee."  *Id*. at 485 (internal quotation marks and citation omitted; alteration in original).  Because "the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action . . . an employer can avoid liability by conducting an independent investigation of the allegations against an employee."  *Id*. at 487-88.  Under Tenth Circuit precedent, "simply asking an employee for his version of events may defeat the inference that an employment decision was . .

---

[2] "The 'cat's paw' doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire."  *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, (10th Cir. 2006) (citing *Fables of La Fontaine* 344 (Walter Thornbury trans., Chartwell Books 1984)).  In the federal litigation context, Judge Richard Posner inaugurated the descriptor "cat's-paw" for this category of claim in *Shager v. Upjohn Co*., 913 F.2d 398, 405 (7th Cir. 1990).

. discriminatory." *Id*. at 488. Here, even assuming that his subordinates' reports, findings of

fact, and recommendations were biased, Defendant Denko requested Plaintiff's version of events

and allowed him to dispute the charges against him on two separate occasions. *See* Plaintiff's

responses to the Notice and Amended Notice of Contemplated Disciplinary Action, Defs.' MSJ,

Exs. 20, 22. After Plaintiff's second submission to Defendant Denko, Defendant Denko

succinctly replied, "I find that your response is not persuasive." Notice of Final Disciplinary

Action at 1, Defs.' MSJ, Ex. 1. Because Defendant Denko asked Plaintiff for his version of

events, and because there is no other evidence to support Plaintiff's theory, Plaintiff has failed to

create a genuine issue of material fact concerning Defendant DPS' liability for engaging in

discriminatory retaliation.

  Plaintiff also asserts that pretext can be shown because Defendant Hall did not file his

complaint about Plaintiff's alleged racist statement until three weeks after it had occurred, and

that there were discrepancies in the recollections of the witnesses who had allegedly heard

Plaintiff's racist statement. Pretext may be established by showing "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons." *Rivera,* 365 F.3d at 925. Here, Plaintiff has at best demonstrated that there may be

questions as to the underlying evidence in the investigation of Plaintiff's racist remark, but he

has not shown that Defendant Denko's reliance on the conclusions of the investigator and the

proffered reasons for Plaintiffs' termination are so implausible and incoherent that a factfinder

would disbelieve Defendant Denko's reasons for terminating Plaintiff. "Perhaps a reasonable

factfinder could observe all the witnesses and believe Plaintiff's version of the events . . .

however, that is not the issue.  What is at issue is whether the evidence of Plaintiff's misconduct

presented to [the employer] was so weak that a rational factfinder could infer that [the

employer's] expressed reason for terminating Plaintiff must have been pretextual."  *Id.* (internal

quotation marks and citation omitted).  Because Defendant Denko based his decision on

substantial evidence and continued to find Plaintiff's version of the events not credible even after

Plaintiff presented his case to Defendant Denko on two separate occasions, a rational factfinder

could not infer that Defendant Denko's reasons for terminating Plaintiff must have been

pretextual.  *See Santana v. City and County of Denver*, 488 F.3d 860 (10th Cir. 2007) ("it is not

[the court's] role to act as a super personnel department that second guesses employers' business

judgments") (quotation marks and citation omitted).  Accordingly, Plaintiff has failed to

establish his Title VII retaliation claim and Defendants are entitled to summary judgment on this

claim.

### B.       First Amendment Retaliation Claim under 42 U.S.C. § 1983

The individual Defendants assert that they are entitled to qualified immunity on

Plaintiff's § 1983 claim for First Amendment retaliation.  Defendants contend that Plaintiff was

not speaking on a matter of public concern and that his speech was not a substantial motivating

factor behind Defendants' decision to terminate him.  Because there was no constitutional

violation, Defendants claim that they are entitled to qualified immunity on this claim.

To prevail on his First Amendment retaliation claim, Plaintiff must show that: (1) the

speech in question involves a matter of public concern; (2) his interest in engaging in the speech

outweighs the government employer's interest in regulating it; and (3) that the speech was a

substantial motivating factor behind the government's decision to take an adverse employment action against the employee.  *Baca v. Sklar*, 398 F.3d 1210, 1218-19 (10th Cir. 2005).

In *Garcetti v. Ceballos*, the Supreme Court held that the "controlling factor" in determining whether a public employee's speech is protected is whether those expressions were made pursuant to the employee's official duties: "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1960 (2006).  The Tenth circuit has identified the primary inquiry under *Garcetti* as whether the speech was uttered pursuant to the plaintiff's job duties, or pursuant to his role as a citizen.  *See Green v. Board of County Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007).  In *Green*, a drug laboratory technician who was concerned about her employer's lack of a confirmation testing policy went around her supervisors by arranging for an outside confirmation test because of her suspicions that a particular drug test had yielded a false positive.  *Id*. at 796.  After the incident, the technician was treated less favorably by her employer and was eventually terminated, leading to her claim of First Amendment retaliation.  The district court granted the employer summary judgment.  On appeal, the Tenth Circuit affirmed the ruling because the technician "was not communicating with newspapers or her legislators or performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do."  *Id*. at 800-01.

Here, there are two instances of speech that Plaintiff claims are protected under the First Amendment.  The first concerns Plaintiff's internal complaint about Patrolman Baker, and the

second concerns Plaintiff's internal complaint about New Mexico State Police Sergeant Jaime Leyva, who arrived intoxicated at a crime scene. Both Patrolman Baker and Sergeant Leyva, an officer outside of the Motor Vehicle Transportation Division, but still an employee of Defendant DPS, were outside of Plaintiff's direct chain of command. Plaintiff therefore contends that he stepped outside the bounds of his official duties when he submitted complaints about them. However, Plaintiff's reasoning seems to rely exclusively on a technicality, rather than encompassing a "practical" inquiry as directed by *Garcetti*. *Garcetti*, 126 S.Ct. at 1961-62 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes"). Moreover, Defendant DPS' policies specifically require that "[a]n employee with knowledge of misconduct involving another employee shall verbally notify his/her supervisor . . ." DPS Internal Investigation Policy at 003050, attached to June 22, 2007 Letter from Mark E. Komer to the Court. Because Plaintiff's duties included reporting misconduct by any other DPS employee, he was clearly speaking in accordance with his employment duties, and not as a citizen. Even if his formal duties did not include adhering to this policy, Plaintiff was no doubt required to write internal complaints about officers directly within his chain of command who violated departmental policies or who were intoxicated while on duty, and so writing similar complaints about other DPS officers would certainly be in line with the Tenth Circuit's pronouncement that an employee acts in accordance with his duties when the challenged conduct "stemmed from and were the type of activities that [he] was paid to do." *Green*, 472 F.3d at 800-01. Likewise,

18

Plaintiff used Intra Departmental Correspondence forms for his speech, rather than "communicating with newspapers or [his] legislators or performing some similar activity afforded citizens." *Id*. Because the means used to convey Plaintiff's speech were not available to the general public, *Green* would also seem to require a finding that Plaintiff's speech was not that of a regular citizen, but rather a public employee acting in accordance with his job duties. Therefore, Plaintiff has failed to carry his burden in establishing the first prong of a First Amendment retaliation claim.

Even if Plaintiff were able to establish all three of the factors outlined above, he cannot prevail if the employer proves "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Baca*, 398 F.3d at 1219. Defendants have presented ample evidence that they terminated Plaintiff based on his racist comment and for engaging in gender discrimination against Sergeant Trujillo and not on his filing of internal complaints against Patrolman Baker and Sergeant Leyva. Therefore, Defendants have made a clear showing that Plaintiff's allegedly protected conduct had no impact on the decision to terminate Plaintiff. Because there was no constitutional violation, the individual Defendants are entitled to qualified immunity on this claim. *Albright*, 51 F.3d at 1535.

**C.     Deprivation of Fourteenth Amendment Right to Substantive Due Process Claim under 42 U.S.C. § 1983**

The individual Defendants assert that they are entitled to qualified immunity on Plaintiff's § 1983 claim for violation of his right to substantive due process under the Fourteenth Amendment. Defendants state that Plaintiff did not have a property interest in his employment with Defendant DPS that is entitled to the protection of substantive due process, and that in any

case Defendants' decision to terminate Plaintiff was not arbitrary or capricious.

When determining whether the government has deprived an individual of his due process rights, the court engages in a two-pronged inquiry.  First, the court must consider whether the individual possessed a protected interest giving rise to due process protection.  If that question is answered affirmatively, then the court must proceed to the second inquiry: whether the government afforded the individual an appropriate level of process.  *Garcia v. City of Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000).

Plaintiff has essentially stated two separate substantive due process claims.  The first concerns his property interest in his employment with Defendant DPS, whereas the second relates to his liberty interest in his reputation.  Both interests are entitled to constitutional protection.  *See id.* (the "standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment"); *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir.1994) (noting that a public employee "does have a liberty interest in his good name and reputation as it affects his protected property interest in continued employment").

Though Plaintiff has satisfied the first part of the inquiry, he has failed to demonstrate how his termination qualifies as arbitrary, lacks a rational basis, or shocks the conscience. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir.1998).  Indeed, the record clearly shows that there was an extensive investigation into the racist remark attributed to Plaintiff, and that multiple witness statements corroborated the initial charge raised by Defendant Hall.  The investigator's report was reviewed by both Defendant Maldonado and Defendant Denko, and Plaintiff was provided with two additional opportunities to present his version of the events in question.  Defendant Denko made the final decision to terminate Plaintiff only after the lengthy

review process, which lasted for over a year, was concluded.  After his termination, Plaintiff also

had an opportunity to challenge his termination before the New Mexico State Personnel Board,

but his appeal was dismissed as untimely.

Given these opportunities to contest his termination both before his supervisors and a

neutral body, Plaintiff received all the process he was due.  *See Garcia*, 232 F.3d at 770;

*Kirkland v. St. Vrain Valley School Dist. No. Re-1J*, 464 F.3d 1182, 1995 (10th Cir. 2006)

("because [the employee] was provided with the opportunity for additional procedures to

vindicate his rights but did not avail himself of those opportunities, we believe that the

requirements of due process were satisfied") (quoting *Luellen v. City of E. Chicago*, 350 F.3d

604, 616 (7th Cir.2003)); *cf. Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (holding that the

fundamental requirement of due process "is the opportunity to be heard at a meaningful time and

in a meaningful manner") (citation and internal quotation marks omitted); *Cleveland Bd. of*

*Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (holding that it is an "essential principle of due

process that a deprivation of property be preceded by notice and opportunity for hearing

appropriate to the nature of the case") (citation, alterations, and internal quotation marks

omitted).  Plaintiff has not established a constitutional violation, and the individual Defendants

are therefore entitled to qualified immunity on this claim.  *Albright*, 51 F.3d at 1535.

**D.     New Mexico Constitution Claims**

Plaintiff contends that Defendants cannot be granted summary judgment on all of

Plaintiff's claims because Defendants did not address his New Mexico Constitution claims

directly.  This argument is unavailing because there is no private right of action for a plaintiff to

vindicate his rights under the New Mexico Constitution.  *See Barreras v. State of New Mexico*

*Corrections Dept.*, 133 N.M. 313, 319, 62 P.3d 770, 776 (N.M. Ct. App. 2002) ("In the absence

of affirmative legislation, the courts of this state have consistently declined to permit individuals

to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on

the absence of an express waiver of immunity under the Tort Claims Act").  Because Plaintiff

has not raised any Tort Claims Act claims for which immunity has been waived, he can not

proceed directly with claims based on rights guaranteed by the New Mexico Constitution.  In

addition, counsel for Plaintiff conceded during the motion hearing that Plaintiff could not

proceed on these claims independently.  Accordingly, Plaintiff's claims under the New Mexico

Constitution are dismissed.

### E.      Violation of the New Mexico Inspection of Public Records Act Claim

Plaintiff's IPRA claim presents a number of novel issues which have not been thoroughly

developed in New Mexico case law.  *See, e.g., Derringer v. State*, 133 N.M. 721, 724, 68 P.3d

961, 964 (N.M. Ct. App. 2003) (suggesting that "determin[ing] penalties for compliance [with

the IPRA] after a lawsuit is filed" presents a novel question under New Mexico law).  Thus, to

properly resolve Plaintiff's claim under the New Mexico IPRA, the Court would be required to

engage in statutory interpretation and may be called on to predict how the New Mexico Supreme

Court would rule on Plaintiff's claim.  *See Lovell v. State Farm Mut. Auto. Ins. Co*., 466 F.3d

893, 899 (10th Cir. 2006).  During the motion hearing, counsel for Plaintiff suggested that this

claim should be remanded to the state court from which it was removed.  Though counsel for

Defendants expressed a desire to have all of Plaintiff's claims adjudicated in one forum, the

interests of justice will be better served by allowing Plaintiff to assert his state law claim in a

New Mexico state court.  Because Plaintiff's federal claims have already been disposed of, the

22

Court declines to exercise supplemental jurisdiction over the New Mexico IPRA claim. *See*

*Summum v. Duchesne City*, 482 F.3d 1263, 1276 (10th Cir. 2007) (citation omitted); *see also* 28

U.S.C. § 1367(c)(1) and (3) (a "district court[] may decline to exercise supplemental

jurisdiction" over state law claims if "the claim raises a novel or complex issue of State law" or

if the court "has dismissed all claims over which it has original jurisdiction"). Accordingly,

Plaintiff's New Mexico IPRA claims in Count IV of the Complaint will be remanded to the First

Judicial District Court, Santa Fe County, State of New Mexico.

      **F.**      **Claim for Injunctive Relief**

      Finally, Defendants seek summary judgment on Plaintiff's request for injunctive relief.

Plaintiff claims that he will suffer from further retaliation from Defendants if he is reinstated to

his position with Defendant DPS, and consequently seeks an injunction barring any such

retaliation. In light of the Court's rulings on Plaintiff's federal claims, the Court will not enter

an order reinstating Plaintiff to his former position with Defendant DPS. Therefore, Plaintiff's

conditional request for injunctive relief is moot. Nonetheless, even were the Court to order

Plaintiff's reinstatement, Plaintiff would lack standing to assert a claim for injunctive relief

because he has failed to allege a realistic threat that he would again experience injury as a result

of the complained of conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *F.E.R.*

*v. Valdez*, 58 F.3d 1530, 1534 (10th Cir. 1995). Accordingly, the Court will grant Defendants'

MSJ as to Plaintiff's claim for injunctive relief.

**IT IS THEREFORE ORDERED** that:

I.      Defendants' Motion for Summary Judgment is **GRANTED** in part as to Plaintiff's claims in Counts I, II, and III of Plaintiff's Complaint;

II.     The Court declines to accept supplemental jurisdiction over Plaintiff's claims in Count IV of Plaintiff's Complaint, which claims will be remanded, and expresses no opinion regarding Plaintiff's Motion for Partial Summary Judgment; and

III.    Plaintiffs' request for injunctive relief is **DENIED** as moot.

_____
SENIOR UNITED STATES DISTRICT JUDGE

24